**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
-------------------------------------x
TROY GORDON,                         :
                                     :
        Plaintiff,                   :
                                     :
        v.                           :  Civ. No. 3:03CV01244(AWT)
                                     :
BRUCE MARQUIS, CHIEF OF POLICE,      :
WILLIAM REILLY, ASSISTANT CHIEF OF   :
POLICE, CLIFF SMITH, SERGEANT,       :
THOMAS NULL, SERGEANT, KEVIN JONES,  :
ASSISTANT CHIEF, KATHERINE PEREZ,    :
CAPTAIN; JOSEPH BUYAK, CAPTAIN,      :
PAUL HAMMICK, LIEUTENANT, in their   :
individual and official capacities   :
and THE CITY OF HARTFORD,            :
                                     :
        Defendants.                  :
-------------------------------------x
```

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Troy Gordon ("Gordon") brings this action against

defendants Chief of Police Bruce Marquis ("Marquis"), Assistant

Chief of Police William Reilly ("Reilly"), Sergeant Cliff Smith

("Smith"), Sergeant Thomas Null ("Null"), Assistant Chief Kevin

Jones ("Jones"), Captain Katherine Perez ("Perez"), Captain

Joseph Buyak ("Buyak"), Lieutenant Paul Hammick ("Hammick"), in

their individual and official capacities, and the City of

Hartford in a three-count Amended Complaint.  For the reasons set

forth below, the Defendants' Motion for Summary Judgment is being

granted.

## I.  FACTUAL BACKGROUND

Gordon, a black male, was hired by the Hartford Police

Department in 1994.  While a cadet at the Hartford Police

Academy, Gordon reported an incident to Reilly[1], a supervisor and instructor at the Academy. Gordon reported that, during an Academy examination, he witnessed another recruit, Mark Tedeschi ("Tedeschi"), bring a completed examination to the front of the room where examinations are turned in, and then return to his desk and mark his own examination. Academy staff were unable to determine whether cheating had actually occurred. During the course of his employment by the City of Hartford, no one mentioned this incident to Gordon.[2]

In February 2000, Gordon was transferred to the Auto Theft Task Force, a detached unit which did not operate out of Hartford Police Headquarters. Gordon stated that the benefits of working at the Auto Theft Task Force included: (1) a take-home vehicle, (2) state-issued auto-theft related investigative equipment, (3) power to arrest outside of Hartford, (4) the ability to follow cases outside of city limits, (5) assignment of other officers to assist him, (6) flexible hours, (7) working at an off-site office, and (8) a limited dress code. (See Plaintiff's Affidavit in Support of Motion for Preliminary Injunction (Doc. No. 10), ¶¶

---

[1] Reilly retired in 2004.

[2] Null testified that he had no knowledge that Gordon had reported Tedeschi. Smith testified that he had no knowledge of the incident. Buyak testified that he has no knowledge of Gordon reporting Tedeschi. Jones testified that he had very limited contact with Gordon and has no knowledge about Gordon reporting the alleged cheating incident or other officers for rule violations until before his deposition testimony.

26(a)-(p)).  In approximately October 2000, Gordon was taken off
this unit, but was reinstated to the task force in February 2001.
He remained at the Auto Theft Task Force until he was transferred
to Major Crimes on September 12, 2003.

During the summer of 2000, the Hartford Police Union filed
a grievance regarding the assignment of particular officers to
investigative trainee positions for longer than twelve months
without a change in status to "detective."  The collective
bargaining agreement between the Union and the City provides, at
section 3.8, that employees who are assigned as investigative
trainees may not be assigned to these duties for longer than
twelve months.  The Department of Personnel decided that the
individuals identified in the grievance had to be appointed to
the position of detective or returned to their previous
positions.  The Hartford Police Union then demanded the same for
another list of officers which included Gordon.  Gordon was
promoted to the rank of detective on February 18, 2001.

In November 2000, Lieutenant Lupo directed Gordon to have a
truck towed to police headquarters and to inform the Evidentiary
Services personnel that they needed to process the truck.  After
Gordon secured the vehicle, he told Detective Shaw that the truck
needed to be processed, and Shaw tore up the request form Gordon
had completed.  Gordon reported Shaw's conduct to Lupo, who spoke
to Shaw.  Gordon stood behind Lupo and observed the conversation.

When Lupo told Shaw that the truck needed to be processed, Shaw responded, "Oh, you mean the one that dickhead is trying to pass off as Youth Services?" (Gordon Dep., at 59) Lupo turned around, smiled and asked, "You mean Troy?" Id. After Shaw answered in the affirmative, Gordon told Shaw, "If you call me a name again, I'll put my foot in your behind." Id. Shaw answered, "No the fuck you won't." Id. Shaw then approached Gordon in a "hostile way" and Gordon backed up. Id. Gordon then reported the incident to Sergeant Cunningham, who laughed and said, "Give me a report." Id. at 60. Gordon gave Cunningham a report and both Gordon and Shaw received one-day suspensions. Gordon was told that he was suspended because he had threatened Shaw.[3] Before the suspension, Gordon had a hearing, at which Buyak was the hearing officer. Null testified that he was aware of both the incident and the complaint.

In 2001, Gordon reported to either Null or Smith that Officer Hernandez was towing vehicles which had been stolen and reporting them as abandoned. Gordon discovered that license plates were not being checked through the National Computer and Information Center ("NCIC") to determine whether they were stolen or registered. Problems persisted and Gordon submitted a written report dated February 27, 2003 to Hammick, Smith, Null, and

---

[3] Gordon testified that the one-day suspension was actually punishment for reporting Shaw. (See Gordon Dep., at 60).

Buyak.  At one point, Gordon learned that a tow truck driver dropped off a stolen car in front of his own home.  The tow truck driver told Gordon that Hernandez had ordered him to tow the car.  Gordon, at the direction of Buyak, called Hernandez, who denied the driver's accusation.  Gordon submitted a written report regarding the incident to Buyak.

 On April 12, 2002, Gordon called Sergeant Cronin to ask for advice about handling a sick raccoon in his back yard.  Cronin asked Gordon if he should put him "on line," meaning that Gordon would be placed on-duty and that he could receive calls.  At that time, Gordon allowed Cronin to place him on line.[4]  (Gordon Dep. 100-03).  Windsor animal control officer, Linda Etienne, arrived and determined that the raccoon should be shot.  Gordon called Smith and asked if he could shoot the raccoon.  According to Gordon, Smith said, "Not with our gun."  (Gordon Dep., at 104-06).[5]  Gordon then used his personal firearm to shoot and kill the raccoon.

---

[4] The court notes that the parties disagree as to whether Gordon requested to be put "on line" or whether Gordon merely allowed himself to be put on line for the convenience of Cronin. For purposes of this motion, the court resolves the factual dispute in favor of the non-moving party, the plaintiff. However, the dispute is immaterial, as it is undisputed that Gordon was "on line" at the time he shot the raccoon.

[5] Smith testified that he told Gordon, "Troy do not shoot that animal with your gun."  (Smith Dep., at 49).  For purposes of this motion, the court adopts the plaintiff's version of the facts.

Gordon admits that Hartford police officers are not allowed to use or carry weapons other than those issued by the department while on duty. After an investigation, Gordon was charged with violations of the Hartford Police Department's Code of Conduct. Specifically, Gordon was charged with Negligent Disregard of Departmental Firearms Guidelines in violation of Article VII, section 7.04, Refusal to Obey a Proper Order of a Supervisor in violation of Article VI, section 6.17, and Intentional and Willful Failure to Comply with any Lawful Orders, Procedures, Directives or Regulations, Oral or Written in violation of Article VI, section 6.09. According to the Hartford Police Department Code of Conduct, violations of section 6.17 are penalized by suspensions of 1 to 5 days and penalties for violations of section 7.04 are unclassified. Hammick sent a memorandum to Marquis dated September 12, 2003 explaining the charges. The Firearms Discharge Board of Inquiry, after deliberation, determined that Gordon's discharge of his firearm was not justified. On May 15, 2003, a disciplinary hearing was held and the charges pursuant to sections 6.17 and 7.04 were sustained. Assistant Chief McKoy sent an interdepartmental memorandum concerning the hearing to Marquis. After the hearing, Gordon was notified that he was being suspended for fifteen working days. Marquis sent a letter to Gordon dated August 11, 2003 detailing this penalty. Gordon testified about Reilly,

"[i]t was his investigation I believe of the shooting incident of the raccoon that allowed me to be suspended for 15 days . . . ." (Gordon Dep., at 98).[6]

Gordon claims that he received harsher discipline than other officers. In particular, another officer, Dave Dufault, was involved in an incident where he shot a person. While it was found that Dufault was not justified in discharging his firearm, he received retraining rather than a suspension. Gordon also testified that he was punished for other conduct ranging from an incident arising from a motor vehicle stop, to a missing hat piece, to a citizen complaint concerning a license plate. Gordon has presented no evidence, however, as to how others were disciplined in similar circumstances.

Gordon claims that he was made to comply with the dress code of Major Crimes when he was in the detached unit, which interfered with his work. Gordon testified that another officer, Jeff Antuna, who was assigned to another detached unit, the Fugitive Task Force at the FBI, had not been required to observe the dress code. After Gordon addressed the matter with his supervisor at Auto Theft, he did not have to conform to the dress code while with the detached unit.

Gordon testified that when he received commendations from

---

[6] Reilly was the chairperson of the Firearms Discharge Board of Inquiry, which concluded that Gordon's actions were not justified.

the department, he did not receive memoranda about commendation ceremonies.  Gordon is unaware of whether others received such notice.  Officer DeJesus testified that the list is generally posted.

Gordon, who identifies himself as the only certified instructor in Auto Theft in the Hartford Police Department, requested training outside of Connecticut.  Gordon testified that whenever he made such requests, they were denied and he was told that the department was out of funds.  Gordon claims that others were allowed to seek training outside Connecticut.[7]  According to Null, he "never disapproved training at [his] level," but training requests went through further steps in the chain of command.  (Gordon Dep., 59).  Null testified that training requests entailing tuition fees and out-of-state travel costs were approved only "rarely."  Id. at 58.

Gordon applied for, and was denied, promotion to the rank of Sergeant on two occasions.  This promotion process involves a written test, oral boards, and an interview with the Chief of Police, who makes the ultimate decision.[8]   The City of Hartford

---

[7] Gordon testified that he was denied training opportunities in part because he reported Hernandez.

[8] Gordon testified that he thinks that Reilly had influence over Marquis in terms of promotion decisions, but points to no specific knowledge of such alleged influence.  Null testified that he was not at all involved in the sergeant promotional process.  Jones testified that he did not participate in internal affairs investigations of Gordon and that he had no involvement

Charter provided:

> The chief of police shall . . . subject to the provisions
> of Chapter XVI of this charter . . . appoint and remove
> all other officers and employees of the department.  He
> shall assign all members of the department to their
> respective posts, shifts, details, and duties.  He shall
> make rules and regulations, in conformity with the
> ordinances of the city, concerning the operation of the
> department and the conduct of all officers and employees
> thereof.

City of Hartford Charter, Chapter XVI, Section 2.  The City of
Hartford has adopted policies pertaining to both equal employment
opportunity and affirmative action.  In July 2002, in filling six
vacancies, Marquis, a black male, promoted four white males, one
black male, and one Hispanic male.  He chose not to promote one
Hispanic male and one black male, Gordon.  In December 2002, in
filling three vacancies, Marquis promoted one Hispanic male, one
black male, and one white male.  He chose not to promote one
white male and one black male, Gordon.  After the second denial
of promotion, Gordon met with Marquis to inquire why he had not
been promoted.  Gordon testified that Marquis informed him that
"he heard things that I do things my way and if it's not my way,
it's wrong or whatever" and that Marquis also mentioned the
ongoing investigation into the raccoon shooting incident.
(Gordon Dep., at 88).

　　　Gordon filed an Equal Employment Opportunity ("EEO")

---

in the promotional process.

complaint in February 2003.[9]  Gordon commenced this lawsuit on
July 18, 2003.

On September 12, 2003, Perez[10] told Gordon that he was being
transferred from Auto Theft to Major Crimes.[11]  Perez made the
decision to reassign Gordon and others; Perez's decisions were
approved by the Chief of Police.  Perez told Gordon that he was
being transferred because he had been in Auto Theft for too long,
and that it was best for both the department and Gordon that he
be reassigned.[12]  Gordon disagrees with Perez's reasoning and
claimed that others have been in their assignments for longer
periods of time:  Detective Alice Malcolm (Intelligence, 12
years); Detective Jack Leitao (Major Crimes, over 4 years);
Detective Robert Nelson (Major Crimes, at least 6 years);
Detective Michael Lopez (Major Crimes, over 5 years); Detective

---

[9] Null testified that he did not learn of the EEO complaint
until his deposition on May 19, 2004.  Marquis also testified
that he did not think he had been made aware that he was named in
the EEO complaint.  Buyak testified that he does not know whether
Gordon filed an EEO complaint.  Smith testified that he was not
aware of Gordon's EEO complaint until October 11, 2004.  Reilly
does not recall having seen Gordon's EEO complaint prior to
preparation with his attorney for his deposition testimony in the
instant case.

[10] Perez retired from the Hartford Police Department on April
4, 2004.

[11] Gordon was transferred to Burglary, and then to the
Homicide Division.  (Gordon Aff. in Support of Motion for
Preliminary Injunction, at ¶¶ 23, 25).

[12] Reilly testified that Gordon was transferred from Auto
Theft for "staffing reasons."  (Reilly Dep., at 32).

Jason Thodi (Identification Unit, at least 5 years); and Detective Dixon Vega (Youth Services, at least 6 years). Null testified that "detached detectives" are "rotate[d] . . . back every two or three years." (Null Dep., at 89). Gordon asserts that Perez transferred him in an act of retaliation, explaining, "Kathy Perez and Michael Tedeschi are friends and I told on her friend." (Gordon Dep., at 68).

According to Perez, Gordon had been assigned as an investigator in the Auto Theft Task Force and also held the same position as an investigator at Major Crimes. Perez testified that Gordon's duties "remained the same." (Perez Dep., at 17). At Major Crimes, Gordon was first assigned to a team, but then worked as a "floor" detective, meaning that he worked on cases as they were assigned.

After Gordon's transfer, he contacted the Hartford Police Union to make a complaint. The Union President informed him that he had no grounds to make his complaint. Gordon filed an Amended Complaint on October 2, 2003, which added Perez, Buyak, and Hammick.[13]

Gordon claims that Null did not call him in for overtime as often as he called others. However, Gordon presents no evidence

_____

[13] Perez testified that she was not aware of the filing of this lawsuit until Gordon informed her about it when she met with Gordon to tell him that he was being reassigned. At the time Gordon was transferred to Major Crimes, Null thinks that he was aware of this lawsuit (Null Dep., at 86).

to support this contention.[14]

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law.  Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994).  Rule 56(c) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  See Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury.  The court, therefore, may not try issues of fact.  See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v. Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir. 1975).  It is

---

[14] The defendants produce evidence that between January 2004 and May 2004, Gordon worked 98.75 overtime hours and 15 of the 25 employees in the Major Crimes Division worked fewer overtime hours than Gordon during that period.  However, this evidence does not relate to overtime worked before the filing of the Amended Complaint.

well-established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge." Anderson, 477 U.S. at 255. Thus, the trial court's task is "carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined . . . to issue-finding; it does not extend to issue-resolution." Gallo, 22 F.3d at 1224.

Summary judgment is inappropriate only if the issue to be resolved is both genuine and related to a material fact. Therefore, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. An issue is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248 (internal quotation marks omitted). A material fact is one that would "affect the outcome of the suit under the governing law." Id. As the Court observed in Anderson: "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." Id. Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted. When confronted with an asserted factual dispute, the court must

13

examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses. Immaterial or minor facts will not prevent summary judgment. See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Del. & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)). Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion. Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence. "[M]ere speculation and conjecture" is insufficient to defeat a motion for summary judgment. Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (quoting Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d. Cir. 1990)). Moreover, the "mere existence of a scintilla of evidence in support of the [nonmovant's] position" will be insufficient; there must be evidence on which a jury could "reasonably find" for the nonmovant. Anderson, 477 U.S. at 252.

Finally, the nonmoving party cannot simply rest on the

allegations in its pleadings since the essence of summary judgment is to go beyond the pleadings to determine if a genuine issue of material fact exists.  See Celotex Corp., 477 U.S. at 324.  "Although the moving party bears the initial burden of establishing that there are no genuine issues of material fact," Weinstock, 224 F.3d at 41, if the movant demonstrates an absence of such issues, a limited burden of production shifts to the nonmovant, which must "demonstrate more than some metaphysical doubt as to the material facts, . . . [and] must come forward with specific facts showing that there is a genuine issue for trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067, 1072 (2d Cir. 1993) (quotation marks, citations and emphasis omitted).  Furthermore, "unsupported allegations do not create a material issue of fact."  Weinstock, 224 F.3d at 41.  If the nonmovant fails to meet this burden, summary judgment should be granted.  The question then becomes:  is there sufficient evidence to reasonably expect that a jury could return a verdict in favor of the nonmoving party.  See Anderson, 477 U.S. at 248, 251.

## III.  DISCUSSION

### A.  Count One:  First Amendment Retaliation

To succeed on a First Amendment retaliation claim, the plaintiff must show, by a preponderance of the evidence, that "(1) his speech was constitutionally protected, (2) he suffered

an adverse employment decision, and (3) a causal connection exists between his speech and the adverse employment determination against him, so that it can be said that his speech was a motivating factor in the determination." Gorman-Bakos v. Cornell Co-op Extension of Schenectady County, 252 F.3d 545, 553 (2d Cir. 2001); Zelnik v. Fashion Institute of Technology, 464 F.3d 217, 225 (2d Cir. 2006) (a plaintiff who is a public employee must show "'(1) the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest, . . . (2) he or she suffered an adverse employment action, . . . and (3) the speech was at least a substantial or motivating factor in the [adverse employment action]'") (citation omitted). "Plaintiff has the initial burden of showing that an improper motive played a substantial part in defendant's action. The burden then shifts to defendant to show it would have taken exactly the same action absent the improper motive." Scott v. Coughlin, 344 F.3d 282, 288 (2d Cir. 2003); see also Cotarelo Village of Sleepy Hollow Police Dept., 460 F.3d 247, 252 (2d Cir. 2006) (even if the plaintiff makes a showing as to all three factors, the defendant can win at summary judgment if it demonstrates that "it would have taken the same adverse employment action even in the absence of protected conduct").

In the instant case, Gordon claims to have engaged in protected speech when he reported Tedeschi, when he reported

16

Hernandez, when he made a report about Shaw, when he filed the
EEO complaint, and when he filed this lawsuit.  He claims that he
was subjected to the following adverse employment actions: (1)
denial of promotion to Detective[15], (2) denial of promotion to
Sergeant, (3) denial of training, (4) disproportionate
discipline, (5) a fifteen-day suspension resulting from the
raccoon shooting incident, (6) transfer from Auto Theft to
Burglary/Homicide, and (7) disproportionately applied dress code
rules.  As discussed below, Gordon's claims fail.

### 1.  Protected Speech

Speech is protected if it "may 'be fairly characterized as
constituting speech on a matter of public concern.'"  <u>Morris v.
Lindau</u>, 196 F.3d 102, 110 (1999) (quoting <u>Connick v. Myers</u>, 461
U.S. 138, 146 (1983)).  Whether "an employee's speech addresses a
matter of public concern must be determined by the content, form
and context of a given statement, as revealed by the whole
record."  <u>Connick</u>, 461 U.S. at 147-48.  The content of the speech
is the "most important factor"; "speech about a matter of public
concern may be protected even when made in a private context."
<u>See, e.g.</u>, <u>Thomas v. City of Beaverton</u>, 379 F.3d 802, 810 (9th
Cir. 2004).  However, even if speech relates to a matter of

---

[15] It appears from the record that Gordon takes issue with
the fact he was not promoted to the rank of detective as a
consequence of the grievance filed by the Hartford Police Union
in summer 2000.  However, at that point, Gordon had not yet been
in an investigative trainee position for a year.

public concern, "[t]he determinative question is whether that interest arises from the speaker's status as a public citizen or from the speaker's status as a public employee." Blum v. Schlegel, 18 F.3d 1005, 1012 (2d Cir. 1994) (speech arose from status as public citizen where public employee wrote articles about legalization of marijuana and there was no evidence that employee was attempting to evade a drug testing program or was facing adverse action due to personal marijuana use).  When an employee speaks as a citizen on a "significant public issue," the employee "is protected from reprisal unless the statements are too damaging to the government's capacity to conduct public business to be justified by any individual or public benefit thought to flow from the statements." Garcetti v. Ceballos, 126 S.Ct. 1951, 1964 (2006) (explaining Pickering v. Bd. of Ed. of Township High School Dist. 205, Will Cty, Illinois, 391 U.S. 562 (1968) balancing).

In Garcetti, the Supreme Court explained, "[w]hen . . . the employee is simply performing his or her job duties, there is no warrant for a similar degree of scrutiny."  126 S.Ct. at 1961 (2006).  In Garcetti, the plaintiff wrote a memorandum to his supervisor as part of his duties as a deputy district attorney, advising his supervisor that a case should be dismissed due to government misconduct.  However, the court found that this speech was not protected, as "the First Amendment does not prohibit

managerial discipline based on an employee's expressions made pursuant to official responsibilities." Id. at 1961.  In Barclay v. Michalsky, the court read Garcetti strictly and concluded that where the plaintiff made complaints about other employees' violations of work rules, the record did not "establish incontrovertibly" that the plaintiff had made complaints in fulfillment of her employment duties, and held Garcetti to be inapplicable.  No. 3:04cv1322(JBA), 2006 WL 2616302, at *6 (D. Conn. Sept. 12, 2006).  Similarly, in the instant case, the court concludes that the defendants have not presented sufficient evidence to show that Gordon's complaints about Tedeschi, Shaw, and Hernandez were mandated by his job, and therefore that Garcetti is inapplicable.

Because Garcetti is not dispositive, the court must determine whether Gordon's statements addressed matters of private or public concern.  In Tiltti v. Weise, the Second Circuit found that patrol officers' statements addressed matters of private interest, rather than public concern where the statements dealt with employment conditions.  155 F.3d 596, 602 (2d Cir. 1998).  In Baum v. County of Rockland, the court found that a public employee's EEOC charge which contained "personal complaints about her lack of training, poor supervision and her belief that she was being harassed," was purely personal.  337 F.Supp.2d at 454, 470 (S.D.N.Y. 2004).  At a meeting, the

plaintiff also expressed concerns about the safety of the employer's facility and stated that she had been discriminated against. Insofar as the statements concerned "how the hazardous conditions impacted <u>her</u>," they were private, but insofar as they related to the plaintiff's stated concern for others in the building, they addressed a matter of public concern. <u>Id.</u> at 470. Even though the plaintiff stated that she was concerned that an individual would "discriminate against even more individuals," "the overall tenor of plaintiff's statements appear to be focused on the Dean's treatment of <u>her</u>." <u>Id.</u> at 471.

In <u>Pomozal v. City of Highland Park</u>, the court found that statements concerning cheating on promotional exams, which were connected with pervasive policies of allowing cheating in order to promote certain people, could relate to a matter of public concern. No. 00 C 7472, 2003 WL 1057813, at *9 (N.D. Ill. Mar. 7, 2003). Similarly, statements concerning teachers cheating on publicly administered tests of students address a matter of public concern. <u>See</u> <u>Rodriguez v. Laredo Independent School Dist.</u>, 82 F.Supp.2d 679 (S.D. Tex. 2000). In the instant case, Gordon points to no pervasive system of cheating or a system whereby cheating is tolerated in order that certain individuals be promoted. While ensuring the integrity and competence of the police force is of concern to the public, the reporting that another recruit was cheating shows no more than that Gordon was

concerned about competition as a member of the recruit's class at the Academy.

In Skehan v. Village of Mamaroneck, 465 F.3d 96, 106 (2d Cir. 2006), the court explained that the plaintiff's speech addressed a matter of public concern where it dealt with "misfeasance within the police department and allegations of an on-going cover-up and an attempt to silence those who spoke out against it." Gordon's reporting of Shaw, while it concerned a violation of department rules, did not concern the effects of name-calling on others within the department or the ability of Shaw to deal with the public. Rather, Gordon's report constituted a "personal employment dispute," which is generally not a matter of public concern. Connick, 461 U.S. at 148 n. 8.

Where a police officer goes "beyond his normal job responsibilities by acting as a concerned citizen in disclosing information relevant to whether the police chief could perform his job effectively", the statements address a matter of public concern, as compared to "a typical aspect of his job as a police officer." Schad v. Jones, 415 F.3d 671, 677 (7th Cir. 2005). In the instant case, Gordon, who was investigating auto theft crimes, reported Hernandez's failure to properly identify stolen vehicles. In the interdepartmental memorandum dated February 27, 2003, Gordon informed his supervisors that auto theft statistics were affected by the problem. Although Gordon asserts that

Hernandez was not checking the vehicle numbers properly to determine whether they were stolen, he does not allege that there was department-wide misconduct or corruption. Under the circumstances, Gordon was acting as a police officer, not as a concerned citizen, and his speech is not protected.

Similarly, EEO complaints and lawsuits must address a matter of "public concern" before they are constitutionally protected. See White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1058 (2d Cir. 1993) (plaintiff must show that speech can be "fairly characterized as constituting speech on a matter of public concern" and "that the speech was at least a 'substantial' or 'motivating' factor in the discharge"); Baum, 337 F.Supp.2d at 470 ("[a]n employee's charge of discrimination is not itself protected speech unless it contains matters of public concern"). In Konits v. Valley Stream Cent. High School District, the Second Circuit found that a lawsuit constituted speech on a matter of public concern where the suit "was predicated on speech about gender discrimination against a fellow employee that directly implicated the access of the courts to truthful testimony." 394 F.3d 121, 125-26 (2d Cir. 2005). The Second Circuit took into account that the plaintiff's motive in speaking on behalf of the other employee "had [the] broader public purpose of assisting [the other employee] to redress [the other employee's] claims of gender discrimination" rather than to "redress personal

grievances." Id. at 126 (citations omitted). Compare Saulpaugh

v. Monroe Community Hosp., 4 F.3d 134 (2d Cir. 1993) (finding

that discrimination suit was motivated by "individual employment

situation" as there was no evidence that the plaintiff's suit was

intended to obtain "relief against pervasive or systemic

misconduct" or that it constituted "part of an overall effort . .

. to correct allegedly unlawful practices or bring them to public

attention") (citations omitted). In the instant case, as in

Saulpaugh, there is no evidence that Gordon's EEO complaint or

instant lawsuit are intended to seek redress for other employees.

Rather, Gordon acted purely on his own behalf.[16] Accordingly,

neither the EEO complaint nor the instant lawsuit constitute

protected speech.

### 2. Adverse Employment Action

Even if Gordon's speech were protected, Gordon has not

demonstrated that many of the actions complained of could

constitute adverse employment actions. In the First Amendment

retaliation context, "[o]nly retaliatory conduct that would deter

a similarly situated individual of ordinary fitness from

exercising his or her constitutional rights constitutes an

adverse action." Zelnik, 464 F.3d at 225. In Zelnik, the Second

---

[16] The court notes that Gordon has elected to proceed on a "class of one" equal protection claim, which by definition concerns solely his unique situation, rather than practices implicating a broader group of employees.

Circuit noted the Supreme Court's decision in <u>Burlington Northern and Santa Fe Ry. Co. v. White</u>, 126 S.Ct. 2405 (2006), a Title VII case where the Court addressed what constituted an adverse action, and stated that "[o]ur standard for First Amendment retaliation claims has always been the equivalent to the standard set forth in <u>Burlington Northern</u>." <u>Id.</u> at 227. In <u>Morris v. Lindau</u>, the Second Circuit explained that "[a]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." 196 F.3d 102, 110 (2d Cir. 1999). "'[L]esser actions may meet the adversity threshold' where 'seemingly minor incidents . . . reach a critical mass.'" <u>Anemone v. Metropolitan Transp. Authority</u>, 410 F.Supp.2d 255, 265 (S.D.N.Y. 2006) (quoting <u>Phillips v. Bowen</u>, 278 F.3d 103, 109 (2d Cir. 2002)). However, a plaintiff must "show that an alleged act of retaliation is more than de minimus." <u>Zelnik</u>, 464 F.3d at 226.

Courts have found adverse employment actions in a number of circumstances which "include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." <u>Morris</u>, 196 F.3d at 110. "[I]nstitution of disciplinary proceedings is sufficient in this circuit to constitute an adverse employment decision." <u>Skehan</u>, 465 F.3d at 106.

> Adverse employment actions may include negative evaluation letters, express accusations of lying, assignment [to a teacher] of lunchroom duty, reduction of class preparation periods, failing to process teacher's

insurance forms, transfer from library to classroom
        teaching as an alleged demotion, and assignment to
        classroom on fifth floor which aggravated teacher's
        physical disabilities.

Zelnik, 464 F.3d at 226 (citation omitted).  In Zelnik, a

professor spoke out publicly against a university project and the

school's president refused to recommend the professor for

emeritus status, despite the nominations by the professor's

department.  The court held that denial of emeritus status was

not an adverse action and noted that the "benefit of emeritus

status . . . is merely honorific" and emeritus status did not

provide "any benefit or item of value beyond what is afforded to

other retired faculty members" and the plaintiff did not produce

evidence, beyond conclusory statements, of the intangible value.

Id. at 227, 228.

        In the instant case, Gordon had been assigned to the Auto

Theft Task Force for less than two and one half years, and has

not demonstrated that he will lose any such long-term

professional relationships.  He has presented no evidence to show

that his promotional prospects were better as a member of the

task force, or that he even had the opportunity to be promoted in

that unit.  He has not presented evidence of any pay

differentials.  While Gordon asserts that he utilized special

skills in investigating auto theft crimes, he has not

demonstrated that these skills are sufficiently different from

those he uses in investigations as a "floor" detective.  In fact,

Gordon has not produced any evidence to show that developing a broader base of skills would not be more beneficial to his career. Nor has he established that his duties are sufficiently different. Accordingly, the transfer was not an adverse employment action. In addition, Gordon has not produced evidence that could show that he was treated differently with respect to training or the dress code.

### 3. Causal Connection

Even if Gordon had satisfied the first two elements of a First Amendment retaliation claim, "the causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." Cotarelo, 460 F.3d at 251 (citation omitted). The plaintiff can prove a causal connection "by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." Anemone, 410 F.Supp.2d at 267 (citation omitted). In Anemone, the court found that the plaintiff had adequately pled a causal connection where actions were taken less than a month after the plaintiff revealed information that could be embarrassing to the defendants; one day after the plaintiff's comments were published in the newspaper; and one week after the plaintiff questioned the defendant's commitment to prosecuting corruption. Id. In Birmingham v. Odgen, the plaintiff survived a motion for summary

judgment where, shortly after the plaintiff criticized the police chief, he was excluded from department meetings, afternoon car rides during which "sensitive issues were discussed," the chief stopped speaking to him, and the chief and two lieutenants allegedly contributed to the plaintiff's wife's filing of a "trumped-up domestic abuse complaint."  70 F.Supp.2d 353, 367-68 (S.D.N.Y. 1999).  However, "[a] causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity."  Marchioni v. Board of Educ. of City of Chicago, 341 F.Supp.2d 1036, 1053 (N.D. Ill. 2004); see also Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (in Title VII retaliation case, "[t]he lack of knowledge on the part of particular individual agents is admissible as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity of disparate treatment. . . . A jury, however, can find retaliation even if the agent denies direct knowledge of a plaintiff's protected activities, for example, so long as the jury finds that the circumstances evidence knowledge of the protected activities or the jury concludes that the agent is acting explicitly or implicitly upon the orders of a superior who has the requisite knowledge"); Golub v. City of New York, 334 F.Supp.2d 399, 409 (S.D.N.Y. 2004) (noting that "temporal proximity between knowledge of a protected activity and an adverse employment

27

action may be sufficient to establish causal connection or retaliatory motive in some cases"); <u>Kalb v. Wood</u>, 38 F.Supp.2d 260, 268 (S.D.N.Y. 1999) (no causal connection between filing lawsuit against town and denial of compensation benefits where manager who reviewed application was not aware of lawsuit).

Gordon reported in 1994 that Tedeschi cheated on the Academy examination, but he points to no alleged adverse action occurring prior to 2000. With respect to this activity in 1994, there is insufficient causal connection because of the amount of time which had passed, and the fact that there is no indication that anyone other than Reilly was aware of the incident. While Gordon argues that Perez transferred him in retaliation for reporting her friend, Tedeschi, there is no evidence that could support such a conclusion.

In November 2000, Gordon reported Shaw for calling him a name and also received a one-day suspension because his response to Shaw contained a threat. While Gordon contends that the suspension constituted retaliation for his reporting Shaw, the fact that Gordon actually threatened Shaw undermines this contention. Gordon has also failed to produce evidence to show a causal connection between this incident and any alleged adverse action.

In 2001, Gordon reported Hernandez; he then wrote a memorandum in February 2003. Gordon also wrote a report at the

direction of Buyak when he discovered that the tow truck driver had dropped off a stolen car in front of his own house. The February 2003 memorandum was sent after Gordon had twice been passed over for promotion to Sergeant. Gordon has presented no evidence to show that Marquis was aware of Gordon's reports; similarly, there is no evidence that Perez was aware of the reports. Also, the February 2003 report was submitted after the raccoon incident, but before Gordon's disciplinary hearing. While Gordon sent his report to a group that included Hammick, who was also involved in the raccoon incident investigation, there is no evidence that the board's findings were influenced by Gordon's report. Rather, the evidence shows that Gordon was fairly determined to have violated two provisions of the Code of Conduct, and Marquis' decision to suspend Gordon conformed to the Code's disciplinary provisions.

Gordon filed his EEO complaint in February 2003. He has produced no evidence to show that anyone involved in either his disciplinary hearing or transfer was aware of this complaint. Both of the denials of promotion occurred before the EEO complaint and the instant lawsuit were filed. In fact, the only action occurring after the filing of this lawsuit was the transfer decision. The record does not show that either of Perez or Marquis was aware that this lawsuit had been filed. In addition, Perez was not added as a defendant until after she

informed Gordon of her transfer decision.

Viewing the circumstances in their totality, there is no evidence to show that Gordon was retaliated against because he engaged in protected speech.  This case is similar to <u>Cooney v. Consolidated Edison</u>, where the court found that there was not a sufficient causal connection where "allegedly adverse actions occurred shortly after the plaintiff engaged in some error at the workplace, and the plaintiff has produced no evidence that the responses were any different than [defendants'] responses to similarly situated employees who had engaged in similar errors or improprieties."  220 F.Supp.2d 241, 251 (S.D.N.Y. 2002).

### B.  Count Two:  Denial of Equal Protection

In Count Two of the Amended Complaint, the plaintiff asserts a claim for denial of equal protection because of race.  (<u>See</u> Amended Complaint (Doc. No. 12), ¶ 73).  However, the plaintiff states in his Opposition that "[t]he plaintiff bases his claim not on race, but on the 'class of one' line of cases." (Plaintiff's Memorandum of Law in Opposition to the Defendants' Motion for Summary Judgment (the "Plaintiff's Opposition") (Doc. No. 51), at 11).  Therefore, the court dismisses the plaintiff's equal protection claim based on race and addresses the plaintiff's "class of one" equal protection claim.  Because it is unclear from the Plaintiff's Opposition whether Gordon intends to

rely on the Second Circuit's LeClair[17] line of cases or just the Olech[18] line of cases, the court will address the claim under both theories.[19]  Gordon's claim fails regardless of which of those theories is used.

### 1. **LeClair** Claim

As the Second Circuit recognized in Bizzarro v. Miranda, "the Equal Protection Clause bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'"  394 F.3d 82, 86 (2d Cir. 2005) (citation omitted) (emphasis in original); Giordano v. City of New York, 274 F.3d 740, 750-51 (2d Cir. 2001) (describing standard for "selective-enforcement" claims under the Equal Protection Clause).  The Second Circuit noted that it has "rarely . . . found a constitutional violation" utilizing the LeClair framework, because it is difficult to establish the requisite malice to sustain such a claim.  Bizzarro, 394 F.3d at

---

[17] LeClair v. Saunders, 627 F.2d 606 (2d Cir. 1980).

[18] Village of Willowbrook, et al. v. Olech, 528 U.S. 562, 564 (2000).

[19] See Plaintiff's Opposition, at 10-11 (quoting language from Bizzarro v. Miranda, 394 F.3d 82, 86 (2d Cir. 2005), which refers to the LeClair line of cases).

86. "[A] demonstration of different treatment from persons similarly situated, without more, would not establish malice or bad faith." <u>Crowley v. Courville</u>, 76 F.3d 47, 53 (2d Cir. 1996).

In <u>Bizzarro</u>, the court looked for evidence that the defendants "acted out of any personal dislike" of the plaintiffs and found none, even where one defendant became "enraged, engulfed with anger, screaming at [plaintiff]..." because the defendants' objective was to "secure compliance with agency objectives" rather than "spite, or malice."  394 F.3d at 87.  The court in <u>Morningside Supermarket Corp. v. New York State</u> observed that "[a] successful plaintiff must establish that the governmental actor was motivated by reasons wholly unrelated to any legitimate state objective."  432 F.Supp.2d 334, 340 (S.D.N.Y. 2006) (citation omitted).

In <u>Cobb v. Pozzi</u>, the court directed entry of judgment for the defendants on the plaintiff's selective prosecution claim where it determined that the evidence was insufficient to make out a First Amendment retaliation claim that the defendants disciplined the plaintiffs based on their membership in a union. 363 F.3d 89, 110 (2d Cir. 2004).  Because the defendants are entitled to summary judgment on the plaintiff's First Amendment retaliation claim, to the extent the plaintiff asserts a <u>LeClair</u> claim based on retaliation for engaging in protected speech, summary judgment should be entered in favor of the defendants.

Even if the plaintiff could prove that he was treated differently from other similarly situated individuals, he has not produced evidence that could support a reasonable inference that the defendants acted based on malice or personal dislike of the plaintiff.  The plaintiff's speculation concerning the defendants' motives is insufficient to create a genuine issue of material fact.

### 2.  "Class of One" Claim

In Morningside Supermarket, the court questioned whether there is actually a distinction between LeClair claims and Olech claims.  In that case, the court followed Bizzarro's approach and treated the claims as separate.  See 432 F.Supp.2d at 340 n.2. This court also adopts that approach.

To assert an equal protection claim under the "class of one" theory, the plaintiff must allege that "[he] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  Village of Willowbrook, et al. v. Olech, 528 U.S. 562, 564 (2000).  In Cobb, the Second Circuit explained, "[u]nlike their selective prosecution claim, the plaintiffs' Olech-based equal protection claim is not dependent on their ability to prove that they were disciplined for an impermissible reason."  363 F.3d at 110.  "Rather, an Olech-type equal protection claim focuses on whether the official's conduct was

rationally related to the accomplishment of the work of their agency." Bizzarro, 394 F.3d at 88-89. To prevail, the plaintiff must show "that the irrational disparate treatment was intentional, that is, that the defendants 'knew' they were treating the plaintiff differently from everyone else." Morningside Supermarket, 432 F.Supp.2d at 341.

To recover on a "class of one" claim, "the level of similarity between the plaintiffs and the persons with whom they compare themselves must be extremely high." Neilson v. D'Angelis, 409 F.3d 100, 104 (2d Cir. 2005). Where a plaintiff's "class of one" case relies on "similar circumstances alone," "the standard for determining whether another person's circumstances are similar to the plaintiff's must be . . . whether they are prima facie identical." Id. at 105 (citation omitted). The standard is a demanding one because "the existence of persons in similar circumstances who received more favorable treatment than the plaintiff is offered to provide an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose . . . is all but certain." Id. at 105. In such a case, the plaintiff must show that: "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government

policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendant acted on the basis of a mistake." Id. at 105; Clubside, Inc. v. Valentin, Nos. 05-0541-cv(L), 05-0688-cv(CON), 05-0693-cv(CON), 05-1228-cv(XAP), 2006 WL 3019672, at *13 (2d Cir. Oct. 25, 2006). A plaintiff must prove that he was treated differently from a person who is "prima facie identical in all material respects" and must show that "the challenged governmental action is irrational or arbitrary." Fago v. City of Hartford, No. Civ. 302CV1189(AHN), 2006 WL 860126, at *7 (D. Conn. Mar. 31, 2006).

    In applying Neilson, the court in Angibeau v. Deal examined the record to determine whether individuals were "prima facie identical in all relevant respects," whether the record contained evidence that the defendant "acted irrationally or out of improper motive," and whether there was any "disparate treatment." No. 3:03CV2070(MRK), 2005 WL 2123536, *3, *4 (D. Conn. Sept. 1, 2005). In Fusco v. City of Rensselaer, N.Y., the court found that "broad, conclusory allegations that [plaintiff] was treated differently from all other tenured supervisory municipal police officers and officials" was insufficient to show that someone is "prima facie identical in all relevant respects." No. 03-CV-1487 (TJM/RFT), 2006 WL 752794, at *7 (N.D.N.Y. Mar. 22, 2006). It is appropriate for a court to grant summary

judgment in favor of the defendant "where no reasonable jury could find that the persons to whom the plaintiff compares [himself] are similarly situated." <u>Clubside</u>, 2006 WL 3019672, at *13.

Gordon bases his claim on six areas in which he believes that he was treated differently:

First, Gordon points to the denial of his promotion to Detective. Gordon has failed to create a genuine issue as to whether others who were sufficiently similar were promoted.

Second, Gordon points to the denial of his promotion to Sergeant. However, the record reflects that Gordon was granted an interview with Marquis in connection with both applications for promotion; not all candidates receive such an interview. Gordon cannot show that he was similarly situated in all relevant respects to the individuals chosen such that it would have been irrational for Marquis not to have promoted him.

Third, Gordon takes issue with the denial of his requests for training. While Gordon contends that others were allowed to travel outside Connecticut to obtain training, he has failed both to identify the officers whose requests were granted and to demonstrate that he is similarly situated with respect to those individuals. There is no evidence to support a conclusion that the denial of his requests for training were irrational or arbitrary, as opposed to based the department's asserted lack of

funding.

Fourth, Gordon claims that he was subjected to unfair and disproportionate discipline. Gordon identifies a number of incidents where he received some form of discipline. However, Gordon has produced no evidence to show that the discipline he received was harsher than discipline others received for similar conduct. The Dufault incident is discussed below.

Fifth, Gordon complains of the fifteen-day suspension. Gordon points to the fact that Dufault received retraining after he improperly shot a person, while Gordon received a fifteen-day suspension for shooting a sick animal. Gordon has not produced sufficient evidence for a rational factfinder to conclude that he and Dufault were similarly situated, as he has produced no evidence regarding the circumstances of the shooting in which Dufault was involved. For example, Gordon also does not explain whether Dufault violated a direct order from a superior or used an unauthorized weapon while on duty.

Sixth, Gordon points to his transfer from Auto Theft to Burglary/Homicide. Gordon bases his claim on the fact that others he identified remained assigned to their positions for longer than he was allowed to stay in the Auto Theft unit. Gordon has not produced evidence sufficient to support a conclusion that he is sufficiently similar to the other individuals. Everyone Gordon identified held the rank of

detective, but none of the individuals were assigned to Gordon's detached unit. Furthermore, Gordon cannot show that the decision was arbitrary or irrational. Perez explained that she was moving Gordon and others because it is beneficial to both the department and the individual to gain a greater variety of experience; this does not amount to evidence of arbitrariness. Gordon does not discuss similarities or lack of similarity with others who were moved by Perez for the same reason.

Gordon also claims that he was treated differently with respect to the dress code. He claims that Antuna, who was also assigned to a detached unit, was never required to conform to the department rule. Gordon fails to produce evidence to show that he and Antuna were similarly situated with respect to the requirements of their units. Furthermore, the record reflects that when Gordon brought the matter to the attention of his supervisor in the Auto Theft unit, he was no longer required to wear business clothes while at the detached unit.

Accordingly, summary judgment must be granted in favor of the defendants on Count Two.

### C. Count Three: Liability of the City of Hartford

In <u>Monell v. Dept. of Social Services of the City of New York</u>, the Supreme Court held that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to

be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  436 U.S. 658, 690 (1978). The Court explained that "a municipality cannot be held liable under § 1983 on a respondeat superior theory."  Id. at 691. Here, the plaintiff has failed to produce evidence that could support a conclusion that the City of Hartford had a policy of retaliating against officers who spoke to supervisors about rule violations within the department.  Nor has he produced evidence of any policy of denying officers equal protection.

However, a single act can constitute a municipal policy when certain conditions are met: (1) municipalities are only liable for "acts which the municipality has officially sanctioned or ordered"; (2) "only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability"; (3) "whether a particular official has 'final policymaking authority' is a question of state law"; and (4) "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." City of St. Louis v. Praprotnik, 485 U.S. 112, 123 (1988) (citations omitted).  According to the Second Circuit, "[w]here a plaintiff relies not on a formally declared or ratified policy, but rather on the theory that the conduct of a

given official represents official policy, it is incumbent on the plaintiff to establish that element as a matter of law." <u>Jeffes v. Barnes</u>, 208 F.3d 49, 57-58 (2d Cir. 2000).

The defendants point to the City of Hartford Charter, which gives discretionary authority to the chief of police to make hiring decisions, but limits that authority by requiring that he follow other city ordinances which include an affirmative action and equal employment opportunity policy.  The defendants also point to <u>Looby v. City of Hartford</u>, in which the court found that the fact that the City Charter gave the fire chief authority to appoint and remove employees and to make rules and regulations regarding the operation of the department and the conduct of its employees did not make the fire chief a final decision-maker. 152 F.Supp.2d 181, 188-89 (D. Conn. 2001); <u>see also</u> <u>Knight v. Hartford Police Dept.</u>, No. 3:04CV969(PCD), 2006 WL 1438649, at *21 (D. Conn. May 22, 2006) ("it is evident that the individual defendants [including Chief Marquis] did not have policymaking authority with respect to promotions nor with respect to extending promotional eligibility lists").  Similarly, in the instant case, Marquis' decisions were limited by the City Charter and ordinances.  As the court stated in <u>Looby</u>, "a grant of discretion is not equivalent to policymaking authority."  152 F.Supp.2d at 289.  Here, as in <u>Looby</u>, the plaintiff has failed to demonstrate that Marquis possessed anything other than

discretionary authority.  Similarly, Perez did not possess
policymaking authority when she transferred Gordon.  Marquis
possessed the ultimate authority to make transfer decisions in
addition to employment decisions, and as explained above, he did
not have policymaking authority.

The plaintiff also argues that a municipality may be held
liable where it fails to train or properly supervise its
employees.  However, the plaintiff has produced no evidence to
show that there is a failure to train or properly supervise
police officers who make promotional and staffing decisions.  A
successful claim under this theory must "be based on more than
the mere fact that the misconduct occurred in the first place."
Amnesty America v. Town of West Hartford, 361 F.3d 113, 130 (2d
Cir. 2004).  The record could not support a conclusion that those
with policymaking authority demonstrated "deliberate
indifference" toward the conduct of subordinates.  Id. at 126.

Accordingly, even if the plaintiff had produced sufficient
evidence to support his claims under the First Amendment and
Equal Protection Clause, the City of Hartford could not be found
liable under Monell.

## IV.  CONCLUSION

For the reasons set forth above, the Defendants' Motion for
Summary Judgment (Doc. No. 43) is hereby GRANTED.

The Clerk shall close this case.

It is so ordered.

Signed this 31st day of March 2007 at Hartford, Connecticut.


_____/s/AWT_____
Alvin W. Thompson
United States District Judge